## In re MICROSOFT CORP. ANTITRUST LITIGATION

### No. MDL 1332.

United States District Court, D. Maryland.

Jan. 12, 2001.

Daryl Andrew Libow, Sullivan & Cromwell, Washington, DC, for Microsoft Corp.

William D. Coston, Venable, Baetjer & Howard, Washington, DC, for Compaq Computer Corp.

W. Stephen Smith, Morrison & Foerster, Washington, DC, for Dell Computer.

## OPINION

MOTZ, District Judge.

This multi-district litigation involves sixty-four antitrust actions, sixty-one of which were transferred to this district pursuant to 28 U.S.C. § 1407.[1] After the transfers to this Court, plaintiffs filed a consolidated class action complaint that supersedes the federal claims asserted in all of the transferred actions except *(In re Microsoft Corp. Antitrust Litigation); Gravity, Inc. v. Microsoft Corp.,* 127 F.Supp.2d 728.[2]

---

1. Although Microsoft removed a number of these cases from state courts, it did not attempt to remove seventy-three other actions filed in state court because it believed those cases did not have an arguable basis for federal jurisdiction. By the parties' tally, fifty-eight of these cases remain pending.

2. The plaintiffs in *Gravity* join as defendants with Microsoft three original equipment manufacturers ("OEMs") who allegedly conspired with it to commit antitrust violations. The present plaintiffs do not pursue that theory. I am today issuing a separate opinion in *Gravity.*

Microsoft has filed a motion to dismiss or for summary judgment as to (1) the monetary damages claims of all plaintiffs who did not purchase any software products directly from Microsoft, (2) the foreign plaintiffs' claims, and (3) certain state law claims. The plaintiffs also have filed a motion to remand certain actions to the state courts in which they originally were filed.

This opinion is divided into six parts. The first part sets forth plaintiffs' allegations. The second part addresses what may be loosely described as *"Illinois Brick* issues" relating to Microsoft's motion to dismiss or for summary judgment as to plaintiffs' monetary damages claims. The next three parts discuss, respectively, the claims of the foreign plaintiffs, plaintiffs' motion to remand, and Microsoft's motion to dismiss or for summary judgment as to certain of the state law claims. The sixth and final part briefly sets forth the reasons why I intend to certify my rulings for interlocutory appeal pursuant to 28 U.S.C. § 1292.

## I. PLAINTIFFS' ALLEGATIONS

In their memorandum opposing Microsoft's motion, plaintiffs summarize the allegations made in the Consolidated Class Action Complaint ("CAC"). I have copied these allegations almost verbatim to assure nothing is lost in translation.

### A.

During the mid–1980s, consumers could not perform word processing, spreadsheet or other applications on their personal computer ("PC") unless the word processing or other application's software was compatible and could work with the operating system software of the PC. (CAC ¶¶ 91–107.) The license to use the operating system of the PC was, thus, an essential facility both for the consumer to be able to perform applications and for the application software writers to be able to offer a marketable product for consumers. (CAC ¶¶ 143–47.)

During the mid–1980s, Microsoft had a monopoly over licensing operating systems for Intel-compatible PCs (CAC ¶ 1), and many scores of software applications would work only with the Microsoft operating system. However, the demand of the consumer (or "end user") for Microsoft's operating system for a PC derives primarily from the operating system's ability to enable the consumer to enjoy software applications that the consumer could not enjoy without the operating system. *See, e.g.,* CAC ¶¶ 92, 95, 133. Thus, demand for Microsoft's operating system would decline (and Microsoft's revenues would decline) if a sufficient number of consumers could choose to perform the applications they desire on their PC with a non-Microsoft operating system or a new technology other than an operating system.

For eleven years, Microsoft has abused its operating system licensing monopoly power so as to anticompetitively deprive consumers of a sufficiently available non-Microsoft operating system or any new technology that would permit consumers to perform their applications without the Microsoft operating system. (CAC ¶¶ 1, 2, 99–139.) To achieve its unlawful mission, Microsoft's logic has been simple: anticompetitively deprive consumers of readily available products and deprive products of readily available consumers. (CAC ¶¶ 88, 122, 164.)

### B.

Microsoft does not sell its software to anyone. (CAC ¶ 84.) Instead, it parcels out different bundles of rights with respect to its software. *Id.* These rights, bundled together as a "license," are the only "products" that Microsoft conveys. (CAC ¶¶ 81–88.) Microsoft retains the title and all rights to its software except for those rights which Microsoft expressly conveys through one of these licenses. *Id.*

Microsoft enters one type of license with the OEMs. (CAC ¶ 84.) The "specified purposes" of the license with OEMs permit "them to pre-install [the software] on PCs

sold to end users." Microsoft provides a wholly "different" license, known as the end-user license agreement ("EULA"), to end users. (CAC ¶ 84.) Specifically, Microsoft grants the right to "use the software on the PCs" to and only to end users. *Id.* Microsoft's end-user license is a "take it or leave it" proposition and not a product of negotiation. (CAC ¶¶ 84–88.) The EULA states: "By installing, copying, downloading, accessing or otherwise using the software product, you agree to be bound by the terms of this [Agreement]." Thus, the end user accepts the EULA by "clicking" agreement on the computer or taking other action to indicate acceptance of Microsoft's offer of license rights. The end user "chooses" to enter the EULA license with Microsoft only when the end user first begins to use the operating system and not at the times of purchase, payment, or other incidents of the transaction. (CAC ¶ 88.)

### C.

Between 1995 and the present, OEMs have had no "other viable choice [and Microsoft has] ... effectively forced OEMs to pre-install Microsoft operating systems on their PCs and to act as Microsoft's agents in offering end-user licenses for acceptance or rejection by customers under terms strictly and exclusively dictated by Microsoft." (CAC ¶ 86.) Like OEMs, retailers and others also acted as agents to convey Microsoft's offer to enter the EULA. (CAC ¶¶ 85, 89.) The retailers also did not purchase or receive title to the end-use rights or other aspects of the product, namely, the EULA. *Id.* In fact, the EULA conveyed by retailers expressly provides that it is between Microsoft and the end user, and that Microsoft would provide refunds to prospective end users who did not agree to the "take-it-or-leave-it" terms of Microsoft's EULA. (CAC ¶¶ 88–89.)

### D.

Microsoft intentionally caused end users to suffer unique injury as a direct result of Microsoft's restrictive and exclusionary practices. End users were deprived of the benefits of competition including, but not limited to, technological innovation, market choice, product variety, and substitutable supply, and were also forced to purchase multiple copies of · Microsoft's operating systems. (CAC ¶ 164.)

### E.

Microsoft engaged in approximately fifteen types of exclusionary, predatory, or anticompetitive acts (CAC ¶ 116a–116*o*) in order to deprive consumers of Digital Research's technologically superior and lower cost DR–DOS operating system (CAC ¶ 115) and IBM's technologically superior OS/2 operating system (CAC ¶ 125). Such anticompetitive acts deprived consumers of readily available products (namely, DR–DOS and OS/2) and deprived products of readily available consumers. *Id.* Such anticompetitive conduct also led to a complaint in 1994 by the Department of Justice ("DOJ"). (CAC ¶¶ 11–12.)

The DOJ accused Microsoft of abusing its monopoly power in violation of the Sherman Act. (CAC ¶¶ 11–19.) The DOJ and Microsoft entered a sweeping settlement agreement in which Microsoft agreed not to engage in at least eight separate types of the anticompetitive, exclusionary, or predatory abuse that it had used effectively to eliminate the foregoing competitive products. *Compare* CAC ¶¶ 116a–116*o with* CAC ¶¶ 118–20. By the time the judgment on that settlement was entered in 1995, the lower cost, technologically superior DR–DOS, the technologically superior OS/2, and numerous other prospective competitive products had all been denied to consumers and effectively eliminated as competitors of Microsoft. (CAC ¶¶ 12–14, 111–25.)

Two of the other products that Microsoft's violations denied consumers during the early 1990s were the Mirrors product by Micrographx and Borland's C++ programming language Object Windows

Library ("OWL"). (CAC ¶¶ 123–28.) Mirrors permitted application programs written for Windows to be ported to or used on IBM's OS/2. (CAC ¶ 123.) OWL went further: it permitted porting not just to OS/2 but to the Windows, Macintosh, and Unix systems "with virtually no conversion effort." (CAC ¶ 126.)

The OWL and Mirrors innovations could have created market conditions in which Microsoft's "applications barrier to entry" could have been lessened. (CAC ¶¶ 91–101.) This would have greatly benefitted consumers by, among other things, permitting them to enjoy the thousands of applications available for Microsoft's operating system on PCs with a non-Microsoft operating system. *Id.*

### F.

During 1995 and continuing through November 10, 1995 (when the Class Period starts), Microsoft expanded its antitrust violations. For example, in connection with Microsoft's end-user licenses prior to the Class Period and in the software markets generally, end users had numerous rights. End users had the right to reuse the license on another PC. (CAC ¶ 90.) End users had the right to resell the license. *Id.* And end users enjoyed the right to return the license and obtain a refund if they did not want to accept the license. *Id.* However, with the lower cost or technologically superior DR–DOS and OS/2 operating systems and numerous other products no longer being marketed in the margins of the market, Microsoft was "freed up" during the Class Period to charge a higher profit-maximizing price and impose far more anticompetitive restrictions on end users.

Microsoft did so. (CAC ¶¶ 90, 160–64.) It tripled its prices and, contrary to software industry practice and what had been Microsoft's practices prior to the Class Period, it effected a series of new restrictions on its licensee end users who acquired PCs through the OEM channel. For example, Microsoft prevented end users from effectively returning the Microsoft operating system for a refund (notwithstanding the terms of Microsoft's end-user license). (CAC ¶ 90.) Also, Microsoft prohibited end users from using on newly purchased PCs the Windows 95 or 98 installed on their old PCs. *Id.* Similarly, Microsoft prohibited end users from reselling on a stand-alone basis the Windows operating system licenses acquired when they had purchased their PCs. *Id.*

Microsoft's new EULA restrictions were intended to force the consumer to acquire a new EULA with each new PC and thereby deprive consumers of other products and deprive other products of consumers. (CAC ¶¶ 88, 122, 164.) Over time, Microsoft coupled these restrictions with other anticompetitive steps. These included Microsoft's nearly two-fold increase during 1998 of its prices for licenses of its old and dated (but not obsolete) operating system to the same level of prices charged for licenses of its new operating systems, namely, from $49.00 to $89.00. (CAC ¶¶ 161–63.)

By abusing monopoly power, Microsoft successfully maximized its revenues by directly depriving end users of lower-priced competing products (like the license for DR–DOS) (CAC ¶¶ 101–59) and restricting the availability of lower priced licenses for Microsoft's own dated (CAC ¶ 161) or used operating systems (CAC ¶ 90). *Id.* Thereby, Microsoft "intentionally" caused end users "unique injury." (CAC ¶ 164.) This included, but was "not limited to," depriving consumers of "technological innovation, market choice ... and substitutable supply." *Id.* Indeed, "Microsoft engaged in continuing violations ... which it specifically intended to create market conditions in which end users were forced to purchase Microsoft products and were deprived of competitive substitutes therefor." (CAC ¶ 122.)

### G.

Also during 1995, Microsoft abused its monopoly power to engage in numerous

new exclusionary, predatory, and anticompetitive acts so as to eliminate the potential competitive threat of Intel's Native Signal Processing ("NSP"). (CAC ¶ 130.) NSP could have served "as a platform on which applications could be developed" independent of any specific operating system. This so-called "middleware" would have greatly benefitted consumers by, among other things, enabling them to enjoy applications without a Microsoft operating system. *Id.* It would have presented choice and touched off price and technological competition. Reciprocal to these benefits to consumers, however, were the serious threats to Microsoft's applications barrier to entry that NSP posed. (CAC ¶¶ 91–96, 130.) Accordingly, Microsoft intentionally abused its power to deprive consumers of this product as well. *Id.*

Another product that had the virtue of benefitting consumers, but the reciprocal vice of threatening Microsoft, was Sun Microsystem's Java programming language. (CAC ¶¶ 136–39.) Java would have enabled applications to run on different operating systems with minimal porting. (CAC ¶ 136.) The Java technology promised the same (and many additional benefits) to consumers (and, correspondingly, the same and greater threats to Microsoft) as did OWL and Mirrors. Once again, Microsoft intentionally acted, this time through a profusion of abuses of its monopoly power (CAC ¶¶ 136–39), to deprive consumers of those benefits.

The Netscape Navigator was the "new competitor born on the Internet" that committed a grave offense: it could eventually permit the consumer to use and enjoy application programs without using Microsoft's operating system. (CAC ¶¶ 131–35.) In its rush to deprive consumers of Navigator and the new world that Navigator potentially could open up, Microsoft intentionally hurt all end users by degrading their PCs' functionality and causing them increased vulnerability to security breaches, bugs, and viruses. (CAC ¶ 163.)

### H.

Microsoft leveraged and further abused its monopoly power over operating system licensing to develop monopolies over the licensing of the three most widely used applications (word processing, spreadsheets, and office suites). (CAC ¶¶ 1, 140–59.) Here again, Microsoft's logic was to deprive consumers of readily available products and deprive products of readily available consumers. Thus, Microsoft orchestrated its anticompetitive conduct so as to deprive consumers of any readily available supply of superior or lower-cost competing application programs. (CAC ¶¶ 154a–f, 155–57.) At the same time, Microsoft effectively forced consumers to demand new Microsoft applications. (CAC ¶¶ 154g–1.)

As a result of Microsoft's wrongdoing, end users today (as in the mid–1980s), still have to obtain a license for a Microsoft operating system to enjoy most applications on their PC. But consumers now must pay ten times as much for the operating system licenses as they did during the 1980s and now also must obtain Microsoft licenses for the top three applications. (CAC *passim.*)

## II. ILLINOIS BRICK ISSUES

■ *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), establishes what has become known, in shorthand, as the "indirect-purchaser" rule. The precise holding of *Illinois Brick* is that a party who does not purchase a product directly from an antitrust violator cannot bring a treble-damages action under section 4 of the Clayton Act for an illegal overcharge. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 606 (7th Cir. 1997); *Chatham Brass Co. v. Honeywell, Inc.*, 512 F.Supp. 108, 116 (S.D.N.Y.1981); *Dart Drug Corp. v. Corning Glass Works*, 480 F.Supp. 1091, 1101 (D.Md.1979). Thus, *Illinois Brick*'s applicability turns on two questions. First, did plaintiffs purchase a product directly from the defen-

dant? If not, do plaintiffs seek damages for an illegal overcharge? [3]

## A.

■ Plaintiffs first argue that they were direct purchasers from Microsoft. Although they acknowledge that they did not buy software directly from Microsoft, they assert that the product they purchased was not software itself but EULAs that ran directly between Microsoft and themselves. Plaintiffs emphasize that bricks and software products are profoundly different: bricks are useable when the manufacturing process is complete; software does not become useable until it is "unlocked" when first clicked on. At that moment Microsoft requires that the software user accept the restrictions contained in the accompanying EULA.

Although the EULA may establish a direct relationship between Microsoft and the consumer, that relationship is not sufficient to make the consumer a "direct purchaser" within the meaning of *Illinois Brick*. With the exception of seven of the named plaintiffs (toward whom Microsoft's motion is not directed), plaintiffs do not allege that they purchased either the software or the EULAs directly from Microsoft. The software was installed on a computer prior to purchase, from either an OEM or a retail dealer, and the EULA accompanied the software at purchase. While the terms of the EULA running to the consumer are different from those of the license running from Microsoft to an OEM, that fact is of no present relevance. Whether the consumer buys software or the EULA, the immediate economic transaction constituting the purchase occurs between the consumer and an OEM or retail seller. That is the conclusion reached by the vast majority of state courts that have considered the issue under state antitrust laws, and I agree with them.[4]

## B.

The second question—whether plaintiffs are claiming damages for an illegal overcharge—is more difficult. The damages that plaintiffs are claiming fall into four general categories: (1) "supra-competitive prices" for Windows and three application programs, Word (word processing), Excel (spreadsheets), and Office Suites (office software); (2) denial of the benefit of technologically superior products, including al-

**3.** Although *Illinois Brick* is sometimes referred to as a standing case, *see, e.g., Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir.1998) (" 'Indirect purchasers' generally lack standing under the antitrust laws ...."); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 847–48 (3d Cir.1996) (associating *Illinois Brick* with "antitrust standing doctrine"), the Supreme Court expressly stated in *Illinois Brick* that it was not "address[ing] the standing issue." 431 U.S. at 728 n. 7, 97 S.Ct. 2061. The Court indicated that "the question of which persons have been injured by an illegal overcharge for purposes of s[ection] 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing." *Id.* To the extent that plaintiffs argue that the *Illinois Brick* rule has been displaced by the standing analysis of *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (*"AGC"*), they are incorrect. Although the Third Circuit did so suggest in *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144, 1168 (3d Cir.1993), the court later repudiated that suggestion in *McCarthy*, 80 F.3d at 850–51. Any doubt on the issue is dispelled by the fact that in *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990), the Supreme Court reaffirmed the *Illinois Brick* rule without mentioning *AGC*.

**4.** *See Vacco v. Microsoft Corp.*, No. X–06–CV–000160064S, 2000 WL 1683386 (Conn.Sup. Ct. Oct. 10, 2000); *Siena v. Microsoft Corp.*, C.A. No. 00–1647, —— WL —— (R.I.Super.Ct. Aug. 21, 2000); *Weinberg v. Microsoft Corp.*, No. D–162, 526 (Tex.Dist.Ct. Aug. 18, 2000); *Arnold v. Microsoft Corp.*, No. 00–CI–00123 (Ky.Cir.Ct. July 21, 2000); *Hindman v. Microsoft Corp.*, Civil No. 00–1–0945 (Haw. Cir.Ct. July 20, 2000); *Comes v. Microsoft Corp.*, No. CL 82311, 2000 WL 33176061 (Iowa Dist.Ct. July 11, 2000); *Daraee v. Microsoft Corp.*, Case No. 0004–03311 (Or. Cir. Ct. June 27, 2000); *Krotz v. Microsoft Corp.*, Case No. A416361 (Nev. Dist. Ct. June 22, 2000). *But see Friedman v. Microsoft Corp.*, CV 2000–000722 (Super.Ct.Ariz. Nov. 15, 2000).

ternative operating systems, application programs and middleware products; (3) increased restrictions on plaintiffs' EULA rights; and (4) degradation of computer performance by the tying of Internet Explorer to Windows.

1.

■ Plaintiffs' claims for supra-competitive prices fall squarely within the *Illinois Brick* ban against the recovery of illegal pass-through overcharges. If the prices for Microsoft products were supra-competitive, they were paid by plaintiffs not to Microsoft itself but to the OEMs or retail dealers from whom they purchased computers on which Microsoft software had been installed. Recognizing this fact, plaintiffs seek to circumvent the first prong of the *Illinois Brick* rule (that they be direct purchasers) by arguing that "*Illinois Brick* does not require that monies be paid directly to the [antitrust] violator." (Pls.' Opp'n at 20.)

That proposition is true. However, all of the cases upon which plaintiffs rely arose in critically distinguishable contexts. In three of them, *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535 (4th Cir.1998), and *Sanner v. Board of Trade*, 62 F.3d 918 (7th Cir.1995), the plaintiff and the defendant did not stand at different ends of a chain of distribution with an intermediary between them. Thus, the twin policy concerns that gave rise to the *Illinois Brick* rule—the potentiality of multiple recoveries of overcharges by different sets of plaintiffs in the same distribution chain and the difficulty of apportioning damages among them—simply were not present. In a fourth case, *Chatham Brass*, 512 F.Supp. at 108, the plaintiff did purchase the defendant's products through wholesalers. However, plaintiffs asserted that the defendant violated the Sherman Act in attempting to monopolize the market by dealing directly only with favored sellers. *Id.* at 116. The gravamen of the plaintiff's

complaint was that it had "been forced to assume the status of an indirect purchaser and to bear the additional costs incident to that status." *Id.*

No similar allegation is made here. Plaintiffs' supra-competitive price claims arise, very simply, from the assertion that Microsoft obtained monopoly profits from its sales to OEMs, who passed on these illegal overcharges to plaintiffs. This is the *Illinois Brick* paradigm, and plaintiffs' claims for supra-competitive prices are barred.

2.

At first blush, plaintiffs' claims for the alleged denial of technologically superior (and in some instances, cheaper) products seem qualitatively different from their claims for supra-competitive prices. Microsoft argues, however, that if plaintiffs ultimately recovered on these claims, their damages would be the difference between what plaintiffs paid for the inferior or more expensive Microsoft products and the value of the better products that would have developed in a competitive market. Once quantified, Microsoft contends, these damages become a measurable overcharge. Because OEMs and other intermediaries could sue Microsoft alleging that they had paid too much for the products they had purchased, the problems of potential multiple recoveries and apportionment of damages would recur.

Although I accept Microsoft's logic on the point, I find it intellectually unsatisfying and incomplete. The reason for my discomfort is that the claims for denial of the benefit of technological innovations that allegedly would have developed in an open market seem to relate to damages extrinsic rather than intrinsic to plaintiffs' purchase of Microsoft products. Plaintiffs suffered those damages not as purchasers of Microsoft products but as persons who use computers. When viewed from that perspective, however, plaintiffs' claims have another fatal flaw independent of *Illi-*

*nois Brick:* plaintiffs' lack of standing to assert them.

In *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 537–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (*"AGC"*), the Supreme Court articulated a number of factors for determining the standing of a plaintiff in the domestic marketplace to assert an antitrust claim: (1) the causal connection between the alleged violation and the harm and the defendant's intent to cause that harm; (2) whether the harm is the type for which the antitrust laws provide redress; (3) the directness of the claim; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the problem of speculative injury or complex apportionment of damages. The first three factors weigh in favor of finding that plaintiffs have standing. Plaintiffs allege that Microsoft intended to cause harm to consumers—and succeeded in doing so— by excluding improved products from the market. Since businesses compete through both lower prices and superior performance, a firm's stifling of innovative products would cause antitrust injury. *See Lower Lake Erie,* 998 F.2d at 1168; *cf. Ford Motor Co. v. Lane,* 86 F.Supp.2d 711, 715 (E.D.Mich.2000). The harm Microsoft allegedly inflicted upon consumers was also quite direct.

The last two *AGC* factors, on the other hand, militate against plaintiffs' standing. If, as plaintiffs allege, Microsoft unlawfully prevented competitors from effectively developing and marketing a product, those competitors would be more direct victims of Microsoft's antitrust violations. Their claims would focus upon specific products in a particular factual context and utilize recognized economic models for the calculation of damages. In contrast, calculating plaintiffs' damages, to say nothing of apportioning them, would be not only complex but virtually impossible. I recognize, of course, that the case is now before me on a motion to dismiss, not on a summary judgment record. However, an evidentiary record need not be established to perceive the self-evident proposition that it would be entirely speculative and beyond the competence of a judicial proceeding to create in hindsight a technological universe that never came into existence. It would be even more speculative to determine the relative benefits and detriments that non-Microsoft products would have brought to the market and the relative monetary value of Microsoft and non-Microsoft products to a diffuse population of end users.

Thus, three of the *AGC* factors weigh in favor of finding that plaintiffs have standing, and two of them against it. This is not, however, an instance in which the majority rules. The *AGC* test cannot be mechanically applied without regard to its purpose. The underlying reason that plaintiffs lack standing is that, to the extent they are seeking damages (over and above any overcharge that is barred by *Illinois Brick*) for denial of the benefit of technologically superior products, it is merely coincidental that they purchased Microsoft products at all. They occupy a position no different from any other end user of computer products who never purchased any Microsoft software or EULAs. The damage they allege is a generalized societal harm and, under well-established principles, the suffering of such damage is insufficient to confer standing upon them.[5] *See, e.g., Highland Supply Corp. v. Reynolds Metals Co.,* 327 F.2d 725, 732 (8th Cir.1964) ("Damages claimed in a private

---

5. *Lower Lake Erie,* upon which plaintiffs rely, is not to the contrary. There, the court permitted plaintiffs to recover, inter alia, damages suffered when the defendants exerted monopoly power to prevent product innovations in the transportation of iron ore. However, the lost benefits accrued to the plaintiffs alone. As the court noted, "[t]he [plaintiff] steel companies were the sole customers of the industry involved in the transhipment of ore; indeed, the industry existed for them." 998 F.2d at 1168. In this case it certainly cannot be said that the software industry exists for plaintiffs. They are simply among a multitude of end users of software products.

antitrust suit must be different from those suffered by the general public—i.e., they must be special to the claimant."); *Revere Camera Co. v. Eastman Kodak Co.*, 81 F.Supp. 325, 330 (N.D.Ill.1948) ("[A] plaintiff must allege and prove that . . . violations have been the proximate cause of special injury to his business or property, as distinguished from injury resulting to the public generally.").

### 3.

■ Plaintiffs next claim that they were damaged by virtue of the fact that Microsoft, after allegedly gaining monopolistic power, increased EULA restrictions. A less restrictive EULA is more valuable than a more restrictive one because it allows the consumer wider use of the software—e.g., the consumer might copy the software for use on another computer she owns. This is measurable damage, but it is damage that plaintiffs suffered at the time they purchased computers with Microsoft software installed on them. If their allegations are correct, they paid too much for what they received and were damaged as a result. However, *Illinois Brick* presumes that the OEMs and retail dealers from whom plaintiffs made their purchases likewise paid too much in their transactions with Microsoft. This is the death knell to plaintiffs' claims since the very purpose of the *Illinois Brick* rule is to prevent indirect purchasers, such as plaintiffs, from recovering any portion of a passed-through overcharge.[6]

### 4.

This leaves for consideration plaintiffs' claims for the alleged degradation of the performance of their computers by virtue of the tying of Internet Explorer to Windows. According to plaintiffs, this tying drained memory, decreased speed, and increased the risk of security breaches and bugs.

Microsoft asserts that these claims fail for the same reason as do the claims for denial of the benefit of technological innovation and increased EULA restrictions—i.e., that if what plaintiffs allege is true, they paid an overcharge for the difference between the price they paid and the value they received. I am not persuaded by the argument. The harm plaintiffs allege was to the computers they purchased directly from OEMs or retail dealers, and no problem of potential duplicative recovery or apportionment of damages between plaintiffs and intermediaries in the distribution chain is presented.

■ In my view, however, plaintiffs' claims fail for the independent reason that the damages they allege do not constitute "antitrust injury." Such injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl–O–Mat. Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). *See also Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24, 26 (D.C.Cir.1987) ("[O]nly harm stemming from a reduction in competition qualifies as injury cognizable under the anti-trust laws."); *Ford*, 86 F.Supp.2d at 714 (noting that a plaintiff may recover "only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior."). Here, the degradation of computer performance alleged by plaintiffs is only incidentally related to the alleged anticompetitive behavior. Plaintiffs may have claims sounding in products liability law, but their antitrust claims go a stretch too far.

---

**6.** Plaintiffs point out that the licenses running from Microsoft to OEMs differ from the EULAs running from Microsoft to consumers. The former, in effect, permit OEMs to copy software solely for the purpose of installation. Although apparently true, this fact is immaterial. Microsoft does not contend that the EULAs themselves were passed through to consumers, only that (if plaintiffs' allegations are correct) the overcharge made in connection with the consumers' EULAs were passed through.

### C.

In a footnote in *Illinois Brick*, the Supreme Court indicated that if a "direct purchaser is owned or controlled by its customer," then "market forces have been superseded and the pass-on defense might be permitted." 431 U.S. at 736 n. 16, 97 S.Ct. 2061. This dictum has led to the creation of an "ownership or control" exception (applicable equally where the direct or indirect purchaser controls the other or where the defendant allegedly owns or controls the intermediary) to the *Illinois Brick* rule. *See Brand Name*, 123 F.3d at 605; *Jewish Hosp. Ass'n v. Stewart Mech. Enters.*, 628 F.2d 971, 975 (6th Cir.1980); *In re Mid–Atlantic Toyota Antitrust Litig.*, 516 F.Supp. 1287, 1292 (D.Md.1981). Plaintiffs contend that this case falls within the "control" prong of this exception because Microsoft used its monopoly power "to capture, dominate and exclusively control the OEM distribution channel" and to force the OEMs "to act as [its] agents in offering end-user licenses for acceptance or rejection by customers under terms strictly and exclusively dictated by Microsoft." (CAC ¶¶ 85–86.)

Courts that have adopted the control exception have emphasized that it must be narrowly construed. "[T]he 'control' exception is limited to relationships involving such functional economic or other unity . . . that there effectively has been only one sale." *Jewish Hosp. Ass'n*, 628 F.2d at 975. Unless such a "functional unity" is required, the problems of potential multiple recoveries and apportionment of dam-

ages persist. *SDI Reading Concrete, Inc. v. Hilltop Basic Res., Inc.*, 576 F.Supp. 525, 530 (S.D.Ohio 1983); *Dart Drug*, 480 F.Supp. at 1104. The Seventh Circuit permits the exception to be invoked only where the defendants control the direct purchaser "through interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, trust agreements, or other modes of control separate from ownership of a majority of the wholesalers' common stock." *Brand Name*, 123 F.3d at 605–06.

Plaintiffs' theory would extend the control exception well beyond its existing parameters. Whatever incentives OEMs and independent retail dealers may have to cooperate with Microsoft (or disincentives to sue it),[7] they clearly are separate and independent entities capable of making their own decisions. Plaintiffs themselves have not alleged that on the critical issue—the setting of prices—Microsoft controlled the intermediaries' decision-making processes. The absence of such an allegation alone is fatal to their claims. *Jewish Hosp. Ass'n*, 628 F.2d at 975.

### III. FOREIGN PLAINTIFFS' CLAIMS

Five foreign plaintiffs (two British companies, one Swiss company, one Greek company, and one Greek individual) have filed suits against Microsoft. They assert claims under the Sherman Act and customary international law.[8] They seek to rep-

---

**7.** Of course, it is well established that the fact that direct purchasers may choose not to institute antitrust actions of their own does not establish an exception to the *Illinois Brick* rule. *See Illinois Brick*, 431 U.S. at 746, 97 S.Ct. 2061 ("We recognize that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers."); *In re Beef Industry Antitrust Litig.*, 600 F.2d 1148, 1156 n. 8 (5th Cir.1979) (noting that *Illinois Brick* emphasizes the "difficulty of proof," as opposed to the "deterrence" rationale); *Technical Learning Collective, Inc. v. Daimler–Benz Aktiengesellschaft*, 1980 WL 1943, at *10

(D.Md.1980) ("[W]hether future suits by dealers are either speculative or unlikely is immaterial; *Illinois Brick* holds that the possibility of such suits is sufficient.").

**8.** Plaintiffs also contend that I should exercise supplemental jurisdiction under 28 U.S.C. § 1367. Although it is not evident from their memorandum, plaintiffs' counsel clarified at oral argument that they are suggesting that supplemental jurisdiction be exercised over claims arising under British, Swiss, or Greek law. Assuming that section 1367 extends to claims arising under foreign law, I cannot exercise supplemental jurisdiction claims un-

resent an "international class," consisting of "[a]ll persons and entities who acquired a license outside the United States from Microsoft, an agent of Microsoft, or any entity, under Microsoft's control" for Microsoft software products. (CAC ¶ 75.)

## A.

Four of the foreign plaintiffs allege that they purchased licenses to use Windows operating system software directly from Microsoft. The fifth alleges that it acquired such a license from a Microsoft affiliate, Microsoft Hellas, S.A. If these allegations are correct, the foreign plaintiffs face no *Illinois Brick* bar. Microsoft contends, however, that plaintiffs' Sherman Act claims must be dismissed because this Court lacks subject matter jurisdiction over them.

### 1.

Plaintiffs allege that Microsoft engaged in worldwide monopolistic conduct that had a direct, substantial, and reasonably foreseeable effect on both domestic and export trade and that the conduct gave rise to plaintiffs' injuries. They further allege that Microsoft had a need and intent to develop and maintain an international monopoly for the specific purpose of maintaining its domestic monopoly in the United States.

■ These allegations track the language of section 6a of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"). 15 U.S.C. § 6a. That section provides that the Sherman Act "shall not apply to conduct involving trade or commerce ... with foreign nations unless ... such conduct has a direct, substantial, and reasonably foreseeable effect ... on trade or commerce which is not trade or com-

merce with foreign nations." *Id.* Stated positively, under the FTAIA, the Sherman Act does apply to conduct involving foreign trade or commerce that has a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic trade.[9]

The plaintiffs argue that, when enacting the FTAIA, Congress created subject matter jurisdiction over claims of foreign plaintiffs who participated only in foreign markets. This argument seems somewhat paradoxical because one of the primary purposes of the Act was to ease restrictions imposed by U.S. antitrust law, or perceived by U.S. businessmen to be imposed by U.S. antitrust law, upon export activities and other foreign commerce engaged in by U.S.-owned firms. H.R.Rep. No. 97–686 at 4, 9–10 (1982), 1982 U.S.C.C.A.N. 2487. However, as the legislation evolved through the hearing process, a second purpose emerged: to resolve a "possible ambiguity in the precise legal standard to be employed in determining whether American antitrust law is to be applied to a particular transaction." *Id.* at 5. It was the fulfillment of this second purpose that led to the adoption of the language upon which plaintiffs rely, i.e., that conduct involving foreign trade or commerce have "a direct, substantial, and reasonably foreseeable effect" on domestic commerce.

The ambiguity that this provision of the FTAIA was intended to resolve had arisen primarily in the context of claims arising from anticompetitive acts committed outside of the United States that had effects within the United States. *Id.* The FTAIA does not, however, limit the application of the effects test it adopts to such cases. Thus, in merging its two purposes and through language that has aptly been de-

---

less plaintiffs have other cognizable claims over which I have subject matter jurisdiction. I find that plaintiffs have no such cognizable claims. In any event, even if I had supplemental jurisdiction, I would decline to exercise it under the standards set forth in section 1367(c).

9. The FTAIA also provides that the Sherman Act may apply to "export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States." 15 U.S.C. § 6a. Plaintiffs do not contend that this provision is triggered here.

scribed as "cumbersome and inelegant," 1A Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272 (1997), the FTAIA posited a new formula under which subject matter jurisdiction was created over claims of at least some foreign plaintiffs for injuries suffered abroad as the result of antitrust violations committed by domestic U.S. firms.

Although, as I have said, this result might appear somewhat paradoxical, it cannot be said that it was entirely unintended. A portion of the legislative history relied upon by plaintiffs makes it clear that Congress foresaw this very result. In discussing the effects test, House Report No. 97–686 stated, in part:

> The intent of the Sherman and FTCA Act amendments in H.R. 5235 is to exempt from the antitrust laws *conduct* that does not have the requisite domestic effects. This test, however, does not exclude all persons injured abroad from recovering under the antitrust laws of the United States. A course of conduct in the United States—*e.g.,* price fixing not limited to the export market—would affect all purchasers of the target products or services, whether the purchaser is foreign or domestic. The *conduct* has the requisite effects within the United States, even if some purchasers take title abroad or suffer economic injury abroad. *Cf., e.g., Pfizer, Inc., et al. v. Government of India, et al.,* 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). Foreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do. Indeed, to deny them this protection could violate the Friendship, Commerce, and Navigation Treaties this country has entered into with a number of foreign nations.

*Id.* at 10.

■ This section of the House Report reflects that Congress did contemplate that the effects test would encompass not only conduct committed outside of the United States having effects within the United States, but also conduct committed within the United States having effects both within and outside of the United States. However, when carefully analyzed, this portion of the House Report also demonstrates that Congress did not intend to entitle *all* foreign consumers to bring Sherman Act claims. It is true, as plaintiffs point out, that the second and third sentences indicate that, as a general proposition, there should be no differentiation between foreign and domestic purchasers of products sold in violation of the Sherman Act, provided that the effects test is met. However, the fourth sentence goes on to state that "the conduct has the requisite effects within the United States, *even if some purchasers take title abroad or suffer economic injury abroad.*" *Id.* (emphasis added). It does not say that jurisdiction exists if the plaintiff actually makes the purchase abroad and does not otherwise participate in a U.S. market.

Although this distinction may seem legalistic, it is significant. The concept that a purchaser may take title or suffer injury at a place different from the place where he engages in the sales transaction is well known to the law. However, by using language embodying that concept, the legislative history reflects that Congress was proceeding from the premise that, wherever title is taken or economic injury is suffered, at least some aspect of the sales transaction took place in the United States. Any doubt on that score is resolved by the next-to-last quoted sentence which states that "[f]oreign purchasers should enjoy the protection of our antitrust laws in the *domestic* marketplace, just as our citizens do." *Id.* (emphasis added). Nothing is said about protecting foreign purchasers in foreign markets.

I therefore have no difficulty in concluding that foreign consumers who have not participated in any way in the U.S. market have no right to institute a Sherman Act claim. This conclusion is consonant with the holdings of other courts that have considered the issue. I confess, however, a

difficulty in properly framing my holding. The general proposition that "the concern of the antitrust laws is protection of American consumers and American exporters, not foreign consumers or producers," *'In' Porters, S.A. v. Hanes Printables, Inc.,* 663 F.Supp. 494, 499 (M.D.N.C.1987) (quoting Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* 166 (1986 Supp.)), is not strictly accurate. The critical question is not the nationality of the plaintiff but the location of the marketplace in which he participated. Likewise, although I believe that Judge Crabb's opinion in *In Re Copper Antitrust Litigation,* 117 F.Supp.2d 875 (W.D.Wis.2000), is well-reasoned and sound, her precise analytical approach—based upon an inquiry into whether the effects giving rise to a foreign plaintiff's claims must be the same as the effects caused in the domestic market—would not negate subject matter jurisdiction here. The effects of Microsoft's conduct upon consumers in the domestic and foreign markets allegedly are identical.

The dilemma I face is the same as that confronted by the court in *Galavan Supplements, Ltd. v. Archer, Daniels, Midland Co.,* 1997 WL 732498 (N.D.Cal.1997). There, although subject matter jurisdiction over the claim of a foreign plaintiff under the FTAIA was upheld, plaintiff's injury was found "not [to be] covered by the antitrust laws because plaintiff was neither a competitor nor a consumer in the United States domestic market." *Id.* at *4. Although, as I have indicated, the portion of the legislative history relied upon by plaintiffs ultimately is fatal to their position, the language of section 6a itself does not tie subject matter jurisdiction to the situs of the market in which the plaintiff participated. Thus, I am inclined to believe that

the court in *Galavan* was correct in placing its holding on standing grounds.[10] This approach is consistent with the statutory language, faithful to the legislative history, and respectful of the traditional reluctance of legislatures and courts to extend antitrust laws "to protect foreign markets from anticompetitive effects." *de Atucha v. Commodity Exch., Inc.,* 608 F.Supp. 510, 518 (S.D.N.Y.1985). In any event, whether the issue is resolved as one of jurisdiction or one of standing, the result is the same. I hold that a plaintiff who has not participated in the U.S. domestic market may not bring a Sherman Act claim under the FTAIA.

### 2.

This leaves for consideration the meaning of the term "participate in the U.S. domestic market" as I am using it. Obviously, the term includes engaging in a commercial transaction with a U.S. firm within the geographical boundaries of the United States. By the same token, the term obviously does not include engaging in a commercial transaction with a foreign firm solely within the geographical boundaries of a foreign country.

Thus, jurisdiction clearly is lacking over the claims of the plaintiff who allegedly purchased Windows operating system software from a foreign affiliate of Microsoft in Greece. But what is the status of purchasers who made their purchases directly from Microsoft over the Internet? Have they "participated in the U.S. domestic market"? To a large extent, the Internet has made the concept of territorial borders obsolete, and the drawing of a distinction for jurisdictional purposes on the basis of geographical boundaries seems somewhat

---

**10.** I recognize that only one of the factors articulated by the Supreme Court in *AGC,* the existence of more direct victims of the alleged antitrust violation, clearly weighs against plaintiffs' standing. 459 U.S. at 537–45, 103 S.Ct. 897. However, the doctrine of standing exists independently of any test that has been developed for determining its application in a specific context. To extend a test unthinking-

ly to all other contexts would give the test its own raison d'etre and elevate it over the purpose which it was designed to serve. Therefore, since the situation presented here is well beyond that contemplated by *AGC,* application of the *AGC* factors would be inappropriate. The legislative history of the FTAIA itself is dispositive of the standing issue.

archaic. Plaintiffs themselves, however, have defined the international class they seek to represent as "[a]ll persons who acquired a license [for Microsoft products] *outside the United States.*" (CAC ¶ 75 (emphasis added).) This self-definition seems to comport with existing commercial reality. Indeed, a contrary one might have wide-ranging implications in other contexts, e.g., taxation and the application of long-arm statutes for assertion of personal jurisdiction over foreign parties to contracts consummated over the Internet. Over time, these and similar issues must be legislatively resolved. In the interim, courts must decide Internet-related issues in accordance with conventional norms, however prosaic that might appear.

### B.

■ Alternatively, the foreign plaintiffs assert a claim under the "customary international law of antitrust." Customary international law is based primarily on "customs and usages of civilized nations, treaties and other interstate agreements, the decisions of international tribunals, and the decisions of national tribunals." 48 C.J.S. International Law § 5. It is true that competition policy has been widely discussed on a global level. However, the international agreements regarding antitrust law that the foreign plaintiffs identify are voluntary and lack enforcement mechanisms. *See, e.g.,* "Set of Multilaterally Agreed Equitable Principles and Rules for the Control of Restrictive Business Practices," G.A. Res. 35/63, U.N. GAOR, 35th Sess., 83rd mtg. at 123–24, U.N. Doc.

A/35/592/Add.2 (1980). The dearth of enforceable international antitrust law highlights the inability of the international community to reach a consensus on competition policy. Moreover, no antitrust claim based on customary international law has been recognized in a U.S. court. Without general agreement on standards of international antitrust law, there can be no customary international law of antitrust. Therefore, plaintiffs' claim under customary international law fails.

## IV. REMAND ISSUES

### A.

Thirty-eight of the actions [11] pending before me were originally filed in state court and removed to federal court by Microsoft on the basis of the parties' diversity of citizenship.[12] Plaintiffs have moved to remand those actions, contending that each of them claims less than $75,000 and that, under *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), and *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), their individual claims cannot be aggregated to determine whether the $75,000 jurisdictional amount has been satisfied. The primary issues presented by the motion to remand the cases removed on the basis of diversity are whether a request for injunctive relief or a request for disgorgement of profits is sufficient to meet the jurisdictional amount in controversy.[13]

### 1.

■ Fifteen cases make a claim for

**11.** These cases are *Aikens; Bernard; Brandt; Brems; Campbell; Cheeseman; Colebank; Falgoust; Gianni; Glase; Guice; Haynes; Howard; Jaffe; Klein; Kloth; Knight; Mandel; Manson; McCall; McWhinney; Mims; Moon; Moscowitz; Nielsen; O'Neill; Penix; Pryor* (New Jersey); *Pryor* (New York); *Ray; Rubbright Group; South Dakota Ass'n of Plumbing Contractors; Seastrom; Strickley; Supernovich; Turner; Weinke;* and *Wilson.*

**12.** Six cases that had been removed by Microsoft were remanded to state court prior to the MDL transfer to this district. *See Edwards,*

(D.N.M. Mar. 27, 2000); *Bellinder,* (D.Kan. Mar. 24, 2000); *Melnick,* (D.Me. Mar. 8, 2000); *Baptiste,* (S.D.Fla. Feb. 29, 2000); *Hartman,* (S.D.Fla. Feb. 29, 2000); *Sherwood,* (M.D.Tenn. Feb. 22, 2000). Microsoft did not attempt to remove seventy-three other actions filed in state court because Microsoft believed those cases did not have an arguable basis for federal jurisdiction.

**13.** Several ancillary issues particular to the law of Mississippi and Louisiana, addressed *infra* in Parts IV(A)(3) and IV(A)(4), are also raised.

injunctive relief.[14] Microsoft has established that redesigning its operating system software in order to comply with the injunctions requested in each of the removed cases would cost millions of dollars. A roughly analogous update to the Windows 1998 operating system cost in excess of $58 million. Plaintiffs do not contest this fact. They argue, however, that it is of no moment because the projected cost, spread over the millions of members of the purported classes, would be less than $75,000 per plaintiff.

There has long been a split among the circuits concerning the perspective from which the jurisdictional amount in controversy is to be measured. Some courts look only at the value to the plaintiff of the potential relief requested. *See, e.g., Ericsson Ge Mobile Communications, Inc. v. Motorola Communications & Electronics, Inc.,* 120 F.3d 216, 219–20 (11th Cir.1997). This has become known as the "plaintiff's viewpoint" approach. Other courts have adopted an "either viewpoint" rule, holding that where the value of a plaintiff's potential recovery is below the jurisdictional amount but the potential cost to the defendant exceeds that amount, it is the latter that governs. *See, e.g., In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 609–10 (7th Cir.1997). Although at one time the Fourth Circuit stood in the plaintiff's viewpoint camp, *see Purcell v. Summers,* 126 F.2d 390, 394 (4th Cir.1942), it appears that it would now follow the either viewpoint approach. *See Gov't*

*Emp. Ins. Co. v. Lally,* 327 F.2d 568, 569 (4th Cir.1964).[15]

The measurement question frequently (but not always) arises in the context where multiple plaintiffs have requested injunctive relief. I was presented with the question in *Gilman v. Wheat, First Securities, Inc.,* 896 F.Supp. 507 (D.Md.1995) *("Gilman I"),* where I held that a request for injunctive relief on behalf of a purported class of brokerage customers allegedly wronged by defendant's receipt of payments for placing orders with market makers was insufficient to establish the jurisdictional amount in controversy. The injunction sought by plaintiff would have prohibited defendant from continuing to receive the allegedly unlawful payments. The basis for my holding was that "assuming arguendo that compliance [with the requested injunction] would cost defendant millions of dollars, no individual plaintiff has a sufficient amount in controversy based on their individual pro rata share of the injunction." 896 F.Supp. at 511.

I have no doubt that *Gilman I* was properly decided. However, my articulation of the governing test, while sufficient under the facts with which I was presented, may have been slightly off the mark. By placing direct focus upon the benefit to each individual plaintiff that would accrue from the defendant's compliance with the requested injunction, my opinion could be read as straying into a plaintiff's viewpoint approach in injunction cases. In *Brand Name,* the Seventh Circuit, speaking

14. These cases are *Campbell; Colebank; Haynes; Jaffe; Kloth; Knight; McCall; McWhinney; Mims; Nielsen; O'Neill; South Dakota Ass'n of Plumbing Contractors; Rubbright Group; Weinke;* and *Wilson.* The parties dispute whether all of these cases make claims for injunctive relief. Having reviewed the complaints, I am satisfied that they do.

15. Although I do not cite the case as authority, *see* 4th Cir. R. 36(c), I note that the Fourth Circuit did apply the either viewpoint rule in an unpublished opinion. *Liberty Mut., Fire Ins. Co. v. Hayes,* 122 F.3d 1061, 1997 WL 568673, at *3 (4th Cir.1997). I further note that, as the parties have stated, I must apply

Fourth Circuit law as the transferee court in an MDL proceeding. *See In re Am. Honda Motor Co. Dealerships Relations Litig.,* 941 F.Supp. 528, 536–37 (D.Md.1996). If these cases are returned to transferor courts, presumably the rulings I make in this opinion will be binding under the doctrine of the law of the case, particularly if the Fourth Circuit reviews these rulings on interlocutory appeal. *See In re Korean Air Lines Disaster,* 829 F.2d 1171, 1176 (D.C.Cir.1987), *aff'd on other grounds sub nom. Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989).

through Judge Posner, stated with greater acumen that the crux of the jurisdictional question "is the cost to ... [the] defendant of an injunction running in favor of one plaintiff." 123 F.3d at 610. As the Seventh Circuit noted, *id.* at 609, this cost will frequently coincide with the benefit accruing to each plaintiff. It did so in *Gilman I* and in such cases as *Snow v. Ford Motor Co.*, 561 F.2d 787, 790–91 (9th Cir.1977), and *Packard v. Provident National Bank,* 994 F.2d 1039, 1050 (3d Cir.1993), upon which *Gilman I* relied. But the cost to the defendant and the benefit to the plaintiff will not always be the same, and the present case is a perfect illustration of that point. The monetary benefit to an individual consumer of Microsoft's untying Internet Explorer from Windows would be relatively insubstantial. However, the immense cost to Microsoft of accomplishing this untying would be the same whether it is done for one plaintiff or for millions.[16]

Federal courts must be wary that their limited jurisdiction not be improperly invoked. *Zahn* and *Snyder* make clear that individual claims cannot be aggregated to establish the jurisdictional amount in controversy, and the holdings in *Snow, Packard,* and *Gilman I* were necessary to prevent this rule from being circumvented by prayers for injunctive relief that are simply aggregated monetary claims in another guise. Those holdings, however, should not be read more broadly than their purpose requires. In the final analysis, "in actions seeking declaratory or injunctive relief, ... the amount in controversy is measured by the value of the object in litigation." *Hunt v. Wash, State Apple Adver. Comm'n,* 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In my view, common sense compels the conclusion that "the value of the object" of the requested injunctive relief in these cases, which could not be effected without the expenditure of millions of dollars if granted even to one plaintiff, exceeds $75,000. That is also the conclusion dictated by application of the either viewpoint rule, as refined by the Seventh Circuit, and I will apply that rule here to uphold jurisdiction in the cases in which injunctive relief is claimed.

### 2.

■ Twenty-five cases make a claim for disgorgement of unlawfully obtained profits.[17] Like the requested injunctions, disgorgement would benefit each individual plaintiff less than $75,000, but the aggregate disgorgement would be considerably greater than $75,000. Under prevailing precedents the jurisdictional question turns on whether disgorgement of

---

**16.** Plaintiffs argue that Microsoft's cost of compliance can be considered only if Microsoft can establish that plaintiffs have a "common and undivided interest" in the injunctions they are seeking, thus bringing the case into a recognized exception to the non-aggregation rule of *Snyder* and *Zahn. See Snyder,* 394 U.S. at 355, 89 S.Ct. 1053. Of course, the cost to the defendant of an injunction running in favor of one plaintiff will often be used as the test to determine the amount in controversy in class actions and other multiplaintiff cases. And, as the Seventh Circuit pointed out in *Brand Name,* unless the rule is applied in such cases, there is a risk that "the non-aggregation rule would be violated." 123 F.3d at 610. Properly understood, however, the test is not derived from, and stands independently of, the common and undivided exception to *Snyder* and *Zahn.* It places the focus upon the amount placed in controversy by the claim of a single plaintiff. That said, in a case such as this where an injunction in favor of a single plaintiff—compliance with which would cost the defendant in excess of the jurisdictional amount—would provide the same benefit to all other plaintiffs, the test yields a result consonant with the purpose of the common and undivided interest exception. *Cf. Hoffman v. Vulcan Materials Co.,* 19 F.Supp.2d 475 (M.D.N.C.1998).

**17.** These cases are *Aikens; Brandt; Brems, P.C.; Campbell; Cheeseman; Davenport; Falgoust; Gianni; Glase; Howard; Klein; Kloth; Mandel; McCall; McWhinney; Moon; Moscowitz; Penix; Pryor* (New Jersey); *Pryor* (New York); *Ray; Seastrom Associates Ltd.; Strickley; Supernovich;* and *Turner.* The parties dispute (just as they dispute whether certain cases claim injunctive relief, *see supra* note 14) whether all of these cases make claims for disgorgement of unlawfully obtained profits. Having reviewed the complaints, I am satisfied that they do.

profits falls within the exception to the non-aggregation principle that applies where "two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest." *Snyder*, 394 U.S. at 355, 89 S.Ct. 1053; *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 48 F.Supp.2d 37, 40–43 (D.D.C.1999) ("*Aetna I*").

Again, there is a split of authority on the question. *Compare Aetna I*, 48 F.Supp.2d at 40–43 (holding that a claim for disgorgement falls within the common and undivided interest exception), *and In re Cardizem CD Antitrust Litig.*, 90 F.Supp.2d 819, 828–29 (E.D.Mich.1999) (same), *with Gilman v. BHC Secs., Inc.*, 104 F.3d 1418, 1426–28 (2d Cir.1997) ("*Gilman II*") (holding that a claim for disgorgement does not fall within the exception), *and Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 54 F.Supp.2d 1042, 1049–51 (D.Kan. 1999) ("*Aetna II*"). Doctrinally, this difference in jurisdictional determination flows from a difference in view about the nature of the disgorgement remedy.[18] *Aetna I* and *In re Cardizem* rest their holdings upon the premises that disgorgement is a form of relief separate from, and independent of, individual damage recovery and that disgorgement "would inure to the benefit of the class rather than vindicate any alleged violations of individual rights." *Aetna I*, 48 F.Supp.2d at 41 (quoted in *In re Cardizem*, 90 F.Supp.2d at 826). *Gilman II* and *Aetna II*, on the other hand, found the disgorgement claim to be nothing more than one asserted " 'on behalf of separate individuals for the damage suffered by each due to the alleged conduct of the defendant.' " *Gilman II*,

104 F.3d at 1427 (quoting *Rock Drilling, Blasting, Roads, Sewers, Viaducts, Bridges, Foundations, Excavations & Concrete Work on All Const., Hod Carriers', Bldg. & Common Laborers' Local Union No. 17 v. Mason & Hanger Co.*, 217 F.2d 687, 695 (2d Cir.1954)); *Aetna II*, 54 F.Supp.2d at 1049.

If, as *Aetna I* and *In re Cardizem* further hold, a plaintiff has the right under applicable substantive law to require the defendant to disgorge to him all profits unlawfully obtained from the course of conduct that injured him, invocation of federal diversity jurisdiction is appropriate. In that event, at least theoretically, an individual plaintiff, regardless of the particular damages he has suffered, might recover the entire unjust benefit obtained by the defendant.[19] "A plaintiff may receive a windfall in some cases, but this is acceptable in order to avoid any unjust enrichment on the defendant's part." *In re Cardizem*, 90 F.Supp.2d at 828 (citing North Carolina law on disgorgement). This follows from the nature of the remedy. "Restitution measures the remedy by the defendant's gain and seeks to force disgorgement of that gain. It differs in its goal or principle from damages, which measures the remedy by the plaintiff's loss and seeks to provide compensation for that loss." Dan B. Dobbs, *Law of Remedies* § 4.1(1) (1993).

Here, plaintiffs have claimed disgorgement in addition to their claims for damages, and they have not disavowed their entitlement to that remedy under the substantive state laws giving rise to their causes of action. In light of these facts, I find that the cases that include a claim for

---

**18.** There is a second, largely unspoken, differentiating factor. The opinions in *Gilman II* and *Aetna II*, unlike those in *In re Cardizem* and *Aetna I*, reflected a deep-seated concern that the prayer for disgorgement was being utilized to bring into federal court a series of small claims that did not belong there.

**19.** If that is so as a matter of the applicable substantive law, it is not clear to me why federal jurisdiction must be based upon the

common and undivided interest exception to the non-aggregation rule of *Zahn* and *Snyder*. Jurisdiction would then be founded not upon the aggregation of the claims of different plaintiffs but the single claim of any one of them. *Cf. supra* note 16. It is for that reason that I added the qualifying prepositional phrase "[u]nder prevailing precedents" when earlier stating in the text what the jurisdictional question turns upon.

disgorgement have been properly removed.

3.

■ Although recognizing that generally a claim for attorneys' fees does not provide a sufficient basis for federal jurisdiction, Microsoft based its removal of two cases, *Aikens* and *Falgoust,* in part upon the ground that an exception applies to this rule where, as under Louisiana law, attorneys' fees are awarded to the class representatives, not to the class as a whole. In *In re Abbott Laboratories,* 51 F.3d 524, 526–27 (5th Cir.1995), the Fifth Circuit did so hold. However, several subsequent district court decisions have limited *Abbott Labs* to cases where plaintiffs rely upon a specific statute, such as La. Rev.Stat. Ann. § 51:137, that awards mandatory attorneys' fees as part of a prevailing plaintiff's recovery. *See, e.g., Vaughn v. Mitsubishi Acceptance Corp.,* 1999 WL 1277541 (E.D.La.1999). These cases further hold that the Louisiana class action statute, La.Code Civ. Proc. art. 595, is not alone sufficient for that purpose because it does not provide for a separate award of attorneys' fees but serves only as a vehicle for shifting funds that have been made available to the class. *See In re Gas Water Heater Prods. Liab. Litig.,* 697 So.2d 341 (La.App. 5th Cir.1997), *rev'd on other grounds,* 711 So.2d 264 (La.1998). The complaints in *Aikens* and *Falgoust* do not cite any statute that would mandate the award of attorneys' fees, and in their reply memorandum plaintiffs indicate that section 595 is the only applicable statute. (Pls.' Reply Mot. to Remand at 13.) I will therefore follow the developed law in the Eastern District of Louisiana and hold that plaintiffs' claims for attorneys' fees

should not be counted in determining the jurisdictional amount.

4.

■ Relying upon *Allen v. R & H Oil & Gas Co.,* 63 F.3d 1326, 1329 (5th Cir. 1995), Microsoft removed the *Guice* case on the ground that, because of the nature of punitive damages under Mississippi law, the assertion of such damages falls within the common fund exception to *Zahn* and *Snyder.* The Fifth Circuit, however, recently overruled *Allen, see H & D Tire & Automotive–Hardware Inc. v. Pitney Bowes Inc.,* 227 F.3d 326, 329–30 (5th Cir. 2000), and there is no longer any reason to distinguish between *Guice* and cases arising under the laws of other states, which Microsoft recognizes do not provide a basis for including punitive damages in the calculation of the federal jurisdictional amount in controversy. *See, e.g., Gilman II,* 104 F.3d at 1426–28; *Green v. H & R Block, Inc.,* 981 F.Supp. 951, 953–55 (D.Md.1997). Because Microsoft has asserted no other basis for the removal of *Guice,* I will enter an order remanding it to the Mississippi court from which it was removed.[20]

B.

Microsoft has removed three other cases (*Aikens, Glase,* and *Supernovich* ), on the ground that they state claims arising under federal antitrust laws.[21] Although the general question presented in each of the cases is the same—whether "a federal question is presented on the face of plaintiff's well pleaded complaint," *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)—the particular issues presented in the cases

---

**20.** Microsoft removed one other case, *Bernard.* In its opposition memorandum, Microsoft effectively concedes that this removal was improper. (Microsoft's Opp'n Mot. to Remand at 15 n.19.) I will therefore remand that case as well.

**21.** Microsoft also contends that *McWhinney* and *Falgoust,* two of the cases requesting,

respectively, injunctive relief and disgorgement on state law claims, also assert claims arising under federal antitrust laws. The federal question issue in *McWhinney* is the same as that presented in *Supernovich,* and the federal question issue in *Falgoust* is similar to the one posed in *Aikens.*

vary. They do not require extended discussion.

■ The complaint in *Aikens*, originally instituted in state court in Louisiana, does not plead specific causes of action. However, plaintiffs' factual allegations draw heavily upon the findings made by the district court in *United States v. Microsoft Corp.*, 84 F.Supp.2d 9 (D.D.C.1999), and they accuse Microsoft of having engaged in "anti-competitive practices" and "monopolistic behaviors." The complaint cannot be seeking relief under Louisiana's antitrust statute because that statute is limited to intrastate conduct. *See* La.Rev. Stat. Ann. §§ 51:121–122. Further, the relief requested by plaintiffs is for unjust enrichment. Because they cannot obtain such relief under state law theories that would entitle them to an equivalent remedy, *see infra* note 22, it is inferable that they are stating a federal claim. Their prayer for relief further supports the inference by requesting treble damages, which are not available under Louisiana law. Under these circumstances I am persuaded that a federal question is presented on the face of the *Aikens* complaint.

The complaint in *Glase* expressly alleges that Microsoft's conduct violated both Ohio law and the Sherman Act. It also pleads two causes of action under the latter. Plaintiffs have made no substantial argument in support of their remand motion in *Glase*.

■ The complaint in *Supernovich* presents an extremely close question. The substantive counts assert claims only under Pennsylvania law. However, in their class action allegations, plaintiffs aver that among the common questions of law and fact that predominate over any questions affecting individual class members is whether "Microsoft violated Section One of the Sherman Act and Section Two of the Sherman Act." There is no evident purpose for such allegations unless plaintiffs contemplate the assertion of Sherman Act claims. Accordingly, I find that the face of the *Supernovich* complaint presents a federal question as well.

## V. STATE LAW CLAIMS

Microsoft has moved to dismiss various state law claims on grounds that fall into the following general categories: (1) antitrust claims under the laws of seven states that require "harmonization" with federal law; (2) all non-antitrust claims under the laws of states that would apply the *Illinois Brick* bar; (3) claims under the laws of six states alleged by Microsoft to apply exclusively to intrastate conduct; and (4) claims alleged by Microsoft not to be maintainable as class actions under the laws of two states.[22]

### A.

In eleven of the removed cases, plaintiffs assert claims under the laws of seven

---

22. In addition, Microsoft moves to dismiss five other claims on miscellaneous grounds. First, it asserts that Louisiana law, La. Civ. Code art. 2298, bars plaintiffs' claims for unjust enrichment because they are pursuing other theories that would entitle them to an equivalent remedy. *See Thompson v. Taylor*, 192 So.2d 609, 613 (La.Ct.App.1966); Jeffrey Oakes, *Art. 2298: The Codification of the Principle Forbidding Unjust Enrichment, and The Elimination of Quantum Meruit As a Basis for Recovery in Louisiana*, 56 La. L.Rev. 873, at *12 (1996). Second, it contends that plaintiffs cannot assert a claim under the Maryland Consumer Protection Act because the actionable unfair or deceptive trade practices listed in the statute do not include monopolistic conduct or other violations of the Maryland

Antitrust Act. Md.Code Ann., Comm. Law §§ 13–301, 303. Third, it argues that the allegations made under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. tit. 73, §§ 201–1 to –9, are not made with sufficient particularity. Finally, it seeks dismissal of the claims under Ohio and Tennessee antitrust statutes because those statutes do not apply to unilateral conduct. Ohio Rev.Code Ann. §§ 1331.01–.99; Tenn.Code Ann. §§ 47–25–101, 106. The first two contentions are meritorious. As to the third, while the allegations are conclusory, I find them to be sufficient. The fourth contention, while correctly reciting Ohio and Tennessee law, is irrelevant because the complaints allege not only unilateral conduct, but also conspiratorial conduct.

states that Microsoft contends would follow the rule of *Illinois Brick.*[23] An Arizona trial court has ruled against Microsoft on the issue. *Friedman v. Microsoft Corp.,* CV 2000–000722 (Super.Ct.Ariz. Nov. 15, 2000). In three other states, Iowa, Kentucky, and New Jersey, trial courts have ruled in Microsoft's favor. *Comes v. Microsoft Corp.,* No. CL 82311 (Iowa Dist.Ct. July 11, 2000); *Kieffer v. Mylan Labs.,* No. BER–L–365–99–EM, 1999 WL 1567726 (N.J.Super. Sept. 9, 1999); *Arnold v. Microsoft Corp.,* No. 00–CI–00123 (Ky.Cir.Ct. July 21, 2000). These three trial court decisions are currently on appeal.

Since the presence of the state antitrust claims will not affect the scope of discovery, it makes sense for me to await guidance from the appellate courts in those states. *Cf. La. Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); *see also Co. River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Perhaps while these MDL proceedings are going forward, appellate courts in the other three states (Maryland, Ohio, and Oklahoma) will also be called upon to rule on the issue. Indeed, it may be in the interest of the expeditious resolution of these proceedings for me to request such rulings through the certification procedures available under the laws of the states in question. I will confer with counsel about the advisability of that course of action.

### B.

Plaintiffs in fourteen cases plead non-antitrust causes of action under state law, generally under deceptive trade practices statutes and consumer protection stat-

utes.[24] Microsoft moves to dismiss these non-antitrust state law claims because, it argues, allowing indirect-purchaser suits to go forward under non-antitrust legal theories would erode the indirect-purchaser bar of *Illinois Brick.*

Some states, whose laws are not at issue, have adopted the policy that Microsoft urges. "Allowing [plaintiffs] to sue under [the state deceptive trade practices act] on allegations that are virtually identical to the antitrust allegations ... would essentially permit an end run around the policies allowing only direct purchasers to recover under the Antitrust Act." *Abbott Labs. v. Segura,* 907 S.W.2d 503, 505–06 (Tex.1995); *see also Blewett v. Abbott Labs.,* 86 Wash.App. 782, 938 P.2d 842, 846–47 (1997). Nevertheless, this policy has not been universally adopted. *See, e.g.,* Vt. Stat. Ann. tit. 9, § 2465; *Mack v. Bristol–Myers Squibb Co.,* 673 So.2d 100 (Fla.Dist.Ct.App.1996). In my judgment, Microsoft paints with too broad a brush in seeking to extend this policy to states that have not affirmatively adopted it. Furthermore, I am not persuaded that the authorities Microsoft cites demonstrate that the courts of the eight states in question would rule as Microsoft forecasts. I will briefly state the reasons why.

#### 1. Arizona

Microsoft relies upon *Arizona Downs v. Arizona Horsemen's Foundation,* 130 Ariz. 550, 637 P.2d 1053 (1981). There, the Arizona Supreme Court held that a horse racing regulation, which specifically authorized a particular lease provision, trumped the state's antitrust statute, which generally forbade such a provision. The court opined "there are instances when provisions of an agreement which might normally be considered contrary to

---

**23.** These cases are *Mims* (Arizona); *Ray* (Arizona); *Brems* (Iowa); *Howard* (Kentucky); *Strickley* (Kentucky); *McCall* (Maryland); *Pryor* (New Jersey); *DeJulius* (Ohio); *Glase* (Ohio); *Kloth* (Ohio); and *Prentice* (Oklahoma).

**24.** These cases are *Mims* (Arizona); *Moscowitz* (Connecticut); *Howard* (Kentucky); *Strickley* (Kentucky); *Aikens* (Louisiana); *Falgoust* (Louisiana); *Manson* (Louisiana); *McCall* (Massachusetts); *Turner Corp.* (Massachusetts); *Kloth* (Ohio); *Glase* (Ohio); *DeJulius* (Ohio); *Campbell* (South Carolina); and *Cheeseman* (Vermont).

the antitrust law are nevertheless specifically authorized by other statutes. When this occurs ..., the specific statute should govern over the general." *Id.* at 1062. At one level of abstraction, this statement does support Microsoft's argument. But it does not necessarily follow from a holding that an industry-specific statute or regulation is preeminent in its own field that a generally applicable statute serving one set of purposes overrides another generally applicable statute serving another overlapping set of purposes. That is not to say that the Arizona Supreme Court would not so conclude. However, *Arizona Downs* is too weak a foundation upon which to base that prediction.

### 2. Connecticut

In *CDC Technologies, Inc. v. IDEXX Laboratories, Inc.*, 7 F.Supp.2d 119 (D.Conn.1998), the court held that entry of summary judgment against plaintiff on its antitrust claims dictated denial of parallel claims under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. §§ 42–110a–q, as well. There, however, plaintiffs' antitrust claims failed not on *Illinois Brick* grounds, but on the merits. The court's holding was limited to the proposition that where the unfair methods of competition alleged in the CUTPA claim are the same as the alleged anticompetitive conduct giving rise to the antitrust claims, the former fall with the latter if the defendant's conduct is found not to violate the antitrust laws. It does not necessarily follow that a defendant's successful assertion of an *Illinois Brick* defense has the same effect.

### 3. Kentucky

A trial court in Kentucky has recently held that consumers of Microsoft's products are neither direct purchasers nor in privity with Microsoft as required for consumers to have viable claims under the Kentucky Consumer Protection Act, Ky. Rev.Stat. Ann. §§ 367.110–.310. *Arnold v. Microsoft Corp.*, No. 00–CI–00123 (Ky.Cir. Ct. July 21, 2000). That ruling is presently on appeal. If it is affirmed, it will provide a basis for granting Microsoft's motion in these proceedings. While the appeal is pending, however, I will defer deciding the issue.

### 4. Maryland

In support of its position that plaintiffs do not have a viable claim under the Maryland Consumer Protection Act, Microsoft again cites a case that resolves a conflict between a general statute and an industry-specific statute in favor of the latter. *Gov't Employees Ins. Co. v. Ins. Comm'r*, 332 Md. 124, 630 A.2d 713, 716–18 (1993). For the reasons I have previously stated, I do not believe that such a holding is necessarily dispositive of the issue presented here.[25]

### 5. Massachusetts

The same holds true, perhaps even more so, as to Microsoft's argument regarding the Massachusetts consumer protection law, Mass. Gen. Laws ch. 93A, §§ 2, 9, 11. In *Reiter Oldsmobile, Inc. v. General Motors Corp.*, 378 Mass. 707, 393 N.E.2d 376 (1979), a statute regulating business practices in the automotive industry prescribed specific damages remedies but implicitly excluded private injunctive relief. An older, general consumer protection statute did allow injunctive relief. Upholding the denial of injunctive relief, the Supreme Judicial Court of Massachusetts held only that the remedies provided in an industry-specific law govern over more general remedies.

### 6. Ohio

The two cases cited by Microsoft under Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev.Code Ann. §§ 1345.01–.13, likewise are inconclusive. *Heritage Hills, Ltd. v. Deacon*, in which an action brought

---

**25.** Plaintiffs' claim under the Maryland Consumer Protection Act fails, however, for the independent reason that the actionable unfair or deceptive trade practices listed in the statute do not include monopolistic conduct or other violations of the Maryland Antitrust Act. *See supra* note 22.

under Ohio's consumer protection act involving a residential lease was dismissed, merely recited that the "specific statutory scheme for resolving landlord-tenant disputes would appear to exclude the application of [Ohio's consumer protection act] to residential leases." 49 Ohio St.3d 80, 551 N.E.2d 125, 128 (1990). *Johnson v. Lincoln National Life Insurance Co.*, 69 Ohio App.3d 249, 590 N.E.2d 761, 765 (1990), similarly held only that Ohio's consumer protection act does not apply to insurance policy controversies in light of the extensive statutory framework for regulating the insurance industry and resolving disputes arising within it.

### 7. South Carolina

The only case Microsoft has cited in support of its contention that, under South Carolina law, a specific statute prevails over a more general one is *State v. Tisdale*, 321 S.C. 153, 467 S.E.2d 270, 272 (App.1996), where the South Carolina Court of Appeals held that the trial court did not have authority under an older, more general statute to suspend a statutory mandatory minimum sentence of a third-offense DUI. On its face, that situation is quite different from the one presented here.

### 8. Vermont

In *Vermont Mobile Home Owners' Ass'n v. Lapierre*, the court indicated that the Vermont Consumer Fraud Act ("VCFA"), Vt. Stat. Ann. tit. 9, § 2461, and the Sherman Act "provid[e] the same protections." 94 F.Supp.2d 519, 523 (D.Vt.2000). This statement was made in the context of the court's consideration of cross-motions for summary judgment going to the merits and meant only that the court did not have to analyze the evidence separately as to each claim because a violation of the Sherman Act would also constitute a violation of the VCFA. The case is thus similar to the Connecticut case, *CDC Technologies, Inc. v. IDEXX Laboratories, Inc.*, discussed above. In *CDC Technologies*, the court found that its summary judgment rulings on claims arising from the same factual allegations under antitrust and consumer protection statutes necessarily paralleled one another. Again, it does not necessarily follow, as contended by Microsoft, that a defense to an antitrust claim not based on the merits precludes the underlying conduct from being actionable under the VCFA.

For these reasons, Microsoft's motion to dismiss the non-antitrust claims will be denied. This is not to say that none of the courts of the states in question would ultimately rule in favor of Microsoft's position, but only that the issues cannot be resolved with the assurance that Microsoft suggests. As with the "harmonization" claims, *see* discussion *supra* Part V(A), I will defer my final ruling until a later stage of these proceedings. I will also discuss with counsel the advisability of seeking guidance from the highest courts of Arizona, Connecticut, Massachusetts, Ohio, and South Carolina under the certification procedures provided by the laws of those states.

### C.

Microsoft has moved to dismiss plaintiffs' non-antitrust claims under the laws of Kentucky, Louisiana, Massachusetts, Ohio, South Carolina, and Tennessee on the ground that the relevant statutes apply only to intrastate, not interstate, conduct. I will defer ruling upon the claims under Kentucky law and Tennessee law because trial court decisions on this issue (in favor of Microsoft) are currently on appeal. *Arnold v. Microsoft Corp.*, No. 00–CI–00123 (Ky.Cir.Ct. July 21, 2000); *Sherwood v. Microsoft Corp.*, No. 99C–3592 (Tenn.Cir. Ct. July 5, 2000). As for the claims under the laws of Louisiana, Massachusetts, Ohio, and South Carolina, for the reasons I will now briefly state, I am not persuaded that Microsoft is entitled to the dismissals it seeks. After conferring with the parties, however, I again might certify the question for decision by the highest courts of Massachusetts, Ohio, and South Carolina pursuant to the certification proce-

dures available under the laws of those states.

Microsoft argues that because Louisiana's antitrust statute is limited to intrastate conduct, La.Rev.Stat. Ann. §§ 51:121–152, all of the other claims asserted by plaintiffs under Louisiana law are also so limited. Microsoft has cited no authority in support of that proposition.

Microsoft contends that plaintiffs' claims under the Massachusetts unfair trade practices law must be dismissed because that law, like the Massachusetts antitrust statute, contains an intrastate limitation. Courts have considered the following three geographical factors in determining whether a defendant has committed deceptive and unfair acts "primarily and substantially within the Commonwealth of Massachusetts": (1) where the defendant committed the deceptive or unfair acts or practices; (2) where the plaintiff received and acted upon the deceptive or unfair statements; and (3) where the plaintiff suffered loss. *Clinton Hosp. Assoc. v. Corson Group, Inc.*, 907 F.2d 1260, 1265–66 (1st Cir.1990); *see also Bushkin Assoc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (1985). The second and third factors favor the plaintiffs, while the first factor favors Microsoft. Although plaintiffs may overstate the strength of their case based on their Massachusetts residency, it is not "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Plaintiffs in the Ohio cases assert claims under two statutes, the Valentine Act (Ohio's antitrust statute), Ohio Rev.Code Ann. §§ 1331.01–.15, and the Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev.Code Ann. §§ 1345.01–.13. The cases cited by the parties do not conclusively establish whether these statutes apply only to intrastate conduct. Plaintiffs cite *Pinney Dock & Transport Co. v. Penn Central Corp.*, 1982 WL 1913 (N.D.Ohio 1982), which addressed only a statute of limitations issue under the Valentine Act, not the applicability of that Act to interstate conduct. On the other hand, dictum relied upon by Microsoft in *Bulova Watch Co. v. Ontario Store*, 176 N.E.2d 527 (Ohio 1961), is equally non-dispositive. There, the court stated, "[b]y the Sherman Act of 1890 contracts, combinations and conspiracies in restraint of trade in interstate commerce were made illegal. The Valentine Act ... did the same for intrastate commerce in Ohio and specifically forbade price fixing." *Id.* at 528. Although this dictum establishes that the Valentine Act does cover intrastate commerce, it does not establish that the Act does not cover interstate commerce.

As for the OCSPA, plaintiffs rely upon *Brown v. Market Development, Inc.*, 41 Ohio Misc. 57, 322 N.E.2d 367 (1974), for the proposition that the Act applies to interstate conduct. However, in that case the court addressed only the question of the ability of out-of-state plaintiffs to sue Ohio corporations under the OCSPA for conduct originating in Ohio. Microsoft's reliance upon *Shorter v. Champion Home Builders Co.*, 776 F.Supp. 333 (N.D.Ohio 1991), is equally weak. In *Shorter*, the court stated that the language of the statute "clearly indicates that ... [it] is only applicable if the offending conduct took place within the territorial borders of the state of Ohio." *Id.* at 339. Here, because Microsoft sold products to consumers residing in Ohio, it cannot be said that some of the alleged offending conduct did not take place within the borders of that state. *Cf. Brown v. Liberty Clubs*, 45 Ohio St.3d 191, 543 N.E.2d 783 (1989) (finding an Indiana seller liable to an Ohio consumer for conduct directed toward the consumer in Ohio from outside the state).

Microsoft's only argument as to the claims brought by plaintiffs under the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C.Code Ann. §§ 39–5–10 to –160, is that the South Carolina antitrust law applies only to intrastate con-

duct. Again, Microsoft has cited no authority in support of its position.

D.

■ The complaints brought under New York law assert claims under the state's antitrust statute, known as the Donnelly Act, N.Y. Gen. Bus. Law § 340.[26] New York state case law characterizes the Donnelly Act's treble damages remedy as penal. *See, e.g., Rubin v. Nine West Group, Inc.,* 1999 WL 1425364 (N.Y.Sup. 1999); *Blumenthal v. Am. Soc'y of Travel Agents, Inc.,* 1977 WL 18392 (N.Y.Sup. 1977). Therefore, plaintiffs' class action claims must be dismissed because under New York law a class action cannot be maintained if the remedy is penal. N.Y. C.P.L.R. 901(b).

■ Plaintiffs' class action claims under SCUTPA, S.C.Code Ann. §§ 39–5–10 to –160, must also be dismissed. That Act does not permit suits for damages to be maintained as class actions. § 39–5–140. Citing *Gentry v. Yonce,* 337 S.C. 1, 522 S.E.2d 137 (1999), plaintiffs incorrectly deny there is any such statutory limitation. In *Gentry,* the South Carolina Supreme Court merely reversed the lower court on the issue of the sufficiency of the pleadings. It did not address whether a class action may be brought for damages under SCUTPA. Given the plain language of the statute, there is no basis for me to conclude that such an action would be permitted.

## VI. INTERLOCUTORY APPEAL

28 U.S.C. § 1292(b) provides:

[w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

In my judgment, the following rulings I am making today meet both criteria for an interlocutory appeal: (1) dismissal of plaintiffs' monetary damages claims on *Illinois Brick*-related grounds; (2) dismissal of the foreign plaintiffs' Sherman Act claims; (3) the removability of state actions claiming injunctive relief and/or disgorgement of profits; (4) the removability of the *Supernovich* and *McWhinney* cases on the basis of federal question jurisdiction; and (5) dismissal of plaintiffs' class action claims in the *Gravity* case.[27]

If the Fourth Circuit permits an interlocutory appeal, I will direct that discovery proceed as to all liability issues other than those pertaining exclusively to the *Gravity* plaintiffs' co-conspiracy theory. Because plaintiffs' Sherman Act claims for injunctive relief are not affected by my rulings and because most of plaintiffs' state law claims survive my rulings, full discovery on questions of liability is necessary regardless of the outcome on appeal. Likewise, plaintiffs are entitled to seek monetary relief on their state law claims. Therefore, I will further direct that expert and other generic damages discovery also proceed.

If discovery and an interlocutory appeal proceed simultaneously, it is likely that

26. These cases are *Mandel; Pryor;* and *Seastrom Associates Ltd.* The *Pryor* case will survive the motion to dismiss to the extent that it includes New York common law claims, which, unlike Donnelly Act claims, are permissible in a class action suit under New York law.

27. I do not believe that there is a substantial ground for a difference of opinion about my dismissal of the foreign plaintiffs' claims under customary international law. However, in the event that the Fourth Circuit permits an interlocutory appeal on other rulings, particularly my dismissal of the foreign plaintiffs' Sherman Act claims, it might be appropriate for me to enter judgment in favor of Microsoft on the customary international law claims pursuant to Fed.R.Civ.P. 54(b). I will discuss this question with counsel.

these cases will be ripe for summary judgment ruling within approximately eighteen months, and, in the event that summary judgment motions are denied, that they would be ready for trial not long thereafter. I hope these scheduling goals can be met. This litigation obviously is of importance not only to the parties but to an entire industry, and perhaps to the national economy, as well. It would be a credit to the judicial system if state and federal courts, appellate and trial, worked together to bring all the pending cases to a just and final resolution in a timely and business-like manner. Permitting an interlocutory appeal would greatly assist in that process.

I will enter an order implementing the rulings made in the opinion after conferring with the parties.